UNITED STATES of America,
Plaintiff-Appellee,

v.

J. W. PREWITT, Defendant-Appellant.

No. 76–1998.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1977.
Decided May 19, 1977.

Michael A. Kiefer, Indianapolis, Ind., for defendant-appellant.

James B. Young, U. S. Atty., Bradley L. Williams, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before SWYGERT, CUMMINGS and BAUER, Circuit Judges.

PER CURIAM.

In this case defendant J. W. Prewitt appeals his conviction by a jury for intentionally passing an altered postal money order in violation of 18 U.S.C. § 500.* He also

---

* 18 U.S.C. § 500 states, in pertinent part:

Whoever, with intent to defraud, passes, utters or publishes or attempts to pass, utter or publish any such forged or altered money order or postal note, knowing any material initials, signature, stamp impression or indorsement

challenges the district court's actions in twice citing him for contempt and sentencing him to six months' imprisonment for each citation. We affirm the conviction for passing the altered money order and vacate the contempt convictions, remanding the issue of contempt for a jury trial.

## I

Defendant first contends that the district court erred in not suppressing correspondence taken from his bedroom following his arrest. This correspondence tended to establish that he knew of the altered character of the money orders that he tried to pass, a requisite element for conviction under 18 U.S.C. § 500.

In support of this contention defendant argues that probable cause did not exist for his arrest, thus tainting the subsequent search. The facts surrounding the arrest are that Prewitt entered the Sacks Brothers Loan Company in Indianapolis on December 19, 1975 and offered as payment for a rifle a postal money order for $291. The proprietor suspected that the money order was stolen because it was carelessly folded up and had not been filled out. He contacted the postal inspectors, who immediately arrived and determined that the money order was not stolen. After the postal inspectors left, Prewitt told the proprietor he also wished to purchase a movie camera, projector, and screen. He proposed to pay for this merchandise with another postal money order for $291 which was also crumpled haphazardly. The proprietor again notified the postal inspectors of his suspicions. The postal inspectors then traced both money orders through their serial numbers and discovered that they had been issued in the amount of $1. This caused them to arrest Prewitt.

■ We hold that these circumstances gave the postal inspectors probable cause to make the arrest. Both money orders were made out for identical odd large amounts but were haphazardly folded as if they were

not of great worth. Moreover, Prewitt only attempted to use the second money order after the postal inspectors had implied that the first was legitimate because it was not stolen. Given these facts, the postal inspectors were justified in taking the relatively simple step of tracing the origin of the money orders, which in no way impinged on Prewitt's rights. Once they had done so, the fact that the money orders had been altered further justified arresting the man who tried to spend them.

Defendant also asserts that the correspondence should have been suppressed because he was forced to "authenticate" the letters in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The basis of this claim is that: (1) the search warrant obtained by the postal inspectors only permitted seizure of correspondence from Charles Baker to J. W. Prewitt; (2) the postal inspectors nonetheless seized letters from Charles Baker to "Maji Mabarafu" because Prewitt had admitted that he used the alias Maji Mabarafu; and (3) this information was obtained from Prewitt without *Miranda* warnings.

■ We find no merit to this argument. Prewitt was given *Miranda* warnings when he was arrested on December 19, 1975. On December 22, he was photographed, fingerprinted, and asked whether he used any aliases. This question was routinely asked of arrested persons for the purpose of obtaining identifying information. The requirements of *Miranda* do not attach to the taking of a defendant's aliases in circumstances such as these. The Fifth Amendment prohibits only compelled testimony, and the fact that defendant has certain identifying characteristics which police officials record does not render the disclosure of those characteristics testimonial in character. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). An alias is as much an identifying

thereon to be false, forged, or counterfeited, or any material alteration therein to have been falsely made . . . Shall be fined not more

than $5,000 or imprisoned not more than five years, or both.

characteristic as a defendant's voice or handwriting, and the Supreme Court has held that the compelled production of voice or handwriting exemplars does not violate the Fifth Amendment. *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Our analysis is in accord with that of other circuits with respect to whether *Miranda* warnings must be given when background data is gathered. *See, e.g., United States ex rel. Hines v. La Vallee,* 521 F.2d 1109, 112–13 (2d Cir. 1975); *United States v. Martinez,* 512 F.2d 830, 833 (5th Cir. 1975).

 Prewitt's final argument in support of his claim that the correspondence should have been suppressed is that the warrant, which specified only "correspondence between Charles Baker and J. W. Prewitt" as its object, was too broadly drawn to satisfy the Fourth Amendment. We disagree. At the time the warrant was issued, greater particularity was not possible. Moreover, the description contained in the warrant delineated the property to be seized with enough precision to prevent the police from engaging in a "fishing expedition." The Fourth Amendment, which only prevents "unreasonable" searches and seizures, does not demand that the police be able to minutely identify every item for which they are searching.

Therefore, we hold that the district court did not err in refusing to suppress the correspondence taken from Prewitt's bedroom. Prewitt also asserts that a third money order that was in his possession when he was arrested should have been suppressed because the arrest was made without probable cause. For reasons we have already stated, we find this argument to be meritless.

## II

Defendant next contends that the district court committed reversible error when it twice refused to order an examination to ascertain whether he was mentally competent. The first occasion was at the outset of trial and the second was during sentencing.

 There is no substance to defendant's claim with respect to the first occasion. The trial took place in September 1976. Defendant had been examined at a federal facility in Springfield, Missouri in April 1976 and found competent to stand trial. Moreover, a psychiatrist who examined Prewitt on August 30, 1976, two weeks before the commencement of trial, found him "coherent, self concept explicit, [and] aware of his own action well enough to stand trial at present." The results of this examination were available to the district court. Given these two uncontroverted findings that Prewitt was competent to stand trial, the district court was under no obligation to order a third examination.

The district court's refusal to order another mental examination before sentencing presents more troublesome questions. Defendant interrupted the trial on a number of occasions with obstreperous behavior. At the sentencing hearing the district court was presented with a letter, dated September 22, 1976, from the psychiatrist who had examined the defendant on August 30. The letter stated that Prewitt had deteriorated considerably since the previous evaluation and "was grossly out of contact with reality."

The district court found that the defendant's conduct during trial was a conscious attempt to disrupt the proceedings motivated by pique because he was refused a continuance and was not based on mental incompetence. The determination of competence is factual and we cannot overturn the district court's finding unless it was clearly erroneous.

 We are convinced that the district court's finding was supported by substantial evidence. The defendant's outbursts were conveniently timed to interrupt the prosecution's case. Moreover, a handwritten posttrial motion to reduce the appeal bond that the defendant drafted himself shows great lucidity, belying any argument that he was incompetent. It was within the district court's discretion to re-

ject the conclusion drawn by the psychiatrist in the September 22 letter insofar as that conclusion qualified the psychiatrist's finding twenty-three days earlier that the defendant was competent to stand trial. *Hodges v. United States,* 408 F.2d 543, 555 (8th Cir. 1969). Accordingly, we hold that the district court's refusal to order a mental examination of the defendant before sentencing was not reversible error.

## III

### A.

Defendant challenges the district court's refusal to tender the following jury instruction:

> The Court now instructs you that you may not under the law presume the guilt of the defendant of the crimes charged solely on the basis of the defendant's possession of postal money orders regardless of whether they were in fact altered in some material way.

He asserts that in the absence of this instruction the jury was encouraged to convict him without finding that he had knowledge of the altered character of the money order he had passed—an essential element of the crime charged.

■ This argument is insubstantial. The district court instructed the jury that to convict the defendant it must find beyond a reasonable doubt:

> *First:* That the defendant attempted to pass a materially altered money order.
>
> *Second:* With intent to defraud.
>
> *Third:* With the knowledge that such money order contained a material alteration.

Thus, the jury knew that knowledge was an essential element of the crime defined by 18 U.S.C. § 500.

### B.

■ The defendant also objects to the following instruction which the district court did tender to the jury:

> The word "knowingly" as used in the crime charged means that the act was done voluntarily and purposely, and not because of mistake or accident. Knowledge may be proved by defendant's conduct, and by all the facts and circumstances surrounding the case. No person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate.

He contends that the last sentence of this instruction gave the jury the misleading impression that he had an affirmative duty to investigate the genuineness of the money orders in his possession. We do not read the instruction this way because by its terms it deals with the *intentional* avoidance of knowledge rather than with an affirmative duty to discover facts. Moreover, similar instructions have been approved by this court on a number of occasions. *See, e.g., United States v. Joyce,* 499 F.2d 9, 23 (7th Cir. 1974); *United States v. Grizaffi,* 471 F.2d 69, 75 (7th Cir. 1972). We hold that the instruction was a proper one.

## IV

■ Defendant urges us to set aside the jury's verdict because it was not supported by substantial evidence. We cannot accept this assertion. The money orders were in the defendant's possession and there were a number of facts that might have led the jury to believe that he knew of their altered character. Both money orders were crumpled and were for the identical odd amount of $291. Defendant did not try to spend the second until postal inspectors had apparently cleared the first. Finally, the correspondence taken from his bedroom was evidence of a plot to fraudulently alter money orders.

## V

Defendant's final argument on appeal is that the district court misused its contempt powers. Defendant was twice found in contempt of court during the trial; once just prior to the return of the verdict for an outburst he made at that time as well as for previous disruptive behavior and again during the return of the verdict for another outburst. At sentencing, defendant was given sentences of six months for each con-

tempt citation, with the sentences to be served consecutively. The district court imposed these contempt citations under Fed.R. Crim.P. 42(a).

Defendant asserts that the district court committed reversible error because: (1) the defendant's mental state was questionable at the time of sentencing for contempt; (2) at least part of the defendant's disruptive behavior was aimed at the district judge and therefore the contempt proceedings should have been presided over by a different judge under Rule 42(b); and (3) the aggregate sentence of one year entitled the defendant to a plenary jury trial on the issue of contempt.

■ We have already disposed of defendant's first contention. The district court's finding that the defendant's contemptuous outbursts were the product of his conscious efforts to disrupt the trial rather than his incompetence was supported by substantial evidence and must be upheld.

■ Our examination of the record convinces us that the district judge did not become "personally embroiled" in a battle with the defendant as a result of the defendant's remarks. Accordingly, the removal of the contempt proceedings to a different judge was unnecessary. *United States v. Seale,* 461 F.2d 345, 351 (7th Cir. 1972).

Defendant's third argument—that he was entitled to a plenary jury trial on the issue of contempt—is premised on this court's decision in *Seale.* In *Seale* we held that, if the district court waited until a mistrial or the conclusion of court proceedings to cite for contempt, consecutive contempt sentences would be aggregated for the purpose of determining whether the punishment imposed for contemptuous behavior was great enough to require a jury trial on that issue. 461 F.2d at 356. The usual rule is that if the punishment for criminal conduct exceeds six months' imprisonment the accused must be afforded the right to a jury trial. *Id.* at 352. Defendant contends that his case fits within the precedent set by *Seale* because his aggregate sentence for contempt was one year.

However, the *Seale* court explicitly distinguished the factual situation that it faced from one in which the trial judge issued a contempt citation and imposed punishment immediately upon termination of the contemptuous conduct rather than waiting for the conclusion of the proceedings. The court noted that if its general aggregation rule were applied to such a case it might appear to defendants that the trial judge's summary contempt power was exhausted early in the trial, thereby removing a potent weapon which deters obstreperous defendants from engaging in further contempts. *Id.* at 355.

■ The case at bar does not on its face fit within this exception to the general rule of *Seale.* Although the district court cited the defendant for contempt for specified behavior soon after that behavior occurred rather than waiting until the end of trial, it did not impose punishment until the defendant was sentenced for his violation of 18 U.S.C. § 500. Thus, the rationale supporting the creation of the exception in *Seale* is missing here. The court's power to deter contemptuous behavior through the threat of a summary contempt citation remained undiminished throughout the trial because the defendant had no way of knowing whether the six month limitation for summary contempt had been exceeded.

Moreover, the danger with which the *Seale* court was primarily concerned—that a court might unfairly use the contempt power to impose additional punishment of major dimensions, bypassing the defendant's constitutional right to have a jury decide whether that punishment was warranted—is greater in this case than in a case which fits exactly within the *Seale* exception. When a court both cites for contempt and imposes sentence immediately upon the termination of the contemptuous conduct, the defendant is at all times made aware of the consequences of his disruptive behavior. The immediate imposition of a six month contempt sentence, with the threat of another sentence to be imposed consecutively if he continues to dis-

rupt the proceedings, might well deter the defendant from further contempts. By contrast, when citation and sentencing are separated the defendant has no way of measuring the consequences of future contemptuous behavior throughout the trial. He is therefore more likely to continue to disrupt the proceedings, only to be met at the conclusion of trial with a contempt sentence that greatly exceeds six months.

The Government nonetheless contends that we should expand the exception in *Seale* to take in cases such as the one at bar. It argues that although the district court delayed sentencing, the conduct for which each contempt citation was imposed was still precisely defined, preventing the district court from imposing a greater than six months' sentence on an undifferentiated mass of contemptuous behavior and thereby satisfying one of the major rationales for the general rule of *Seale*. The Government also asserts that the district court's method in this case was superior to the immediate imposition of a contempt sentence because by delaying sentencing the judge allowed any possible anger on his own part to cool and was able to benefit from the presentence report prepared by probation authorities.

The Government's arguments are not without merit and we would find this to be a close case if we were working on a clean slate. However, the Supreme Court's recent decision in *Codispoti v. Pennsylvania*, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974), impels us to hold that the district court exceeded its summary contempt powers in imposing a one year contempt sentence on Prewitt.

In *Codispoti*, three defendants were each given consecutive contempt sentences of one to two years such that the aggregate contempt sentence for each defendant exceeded five years. The Supreme Court directed that the contempt charges be heard by a different judge than the one who had presided at defendants' original criminal trial. *Mayberry v. Pennsylvania*, 400 U.S. 455, 466, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). Upon retrial of the contempt charges de-

fendants were found guilty of contempt, and given sentences of six months' imprisonment or less for each contempt that when aggregated substantially exceeded six months' imprisonment. Defendants' demand for a jury trial on the contempt charges was denied.

The Supreme Court reversed, holding that the defendants were entitled to a jury trial. The Court noted and approved of the exception in *Seale* to the general rule which the *Seale* court followed, citing the need to permit trial judges sufficient discretion to maintain order in the courtroom. 418 U.S. at 513–14, 94 S.Ct. 2687. But the Court made clear that the exception was inapplicable in cases in which "there is no overriding necessity for instant action to preserve order and no justification for dispensing with the ordinary rudiments of due process." *Id.* at 515, 94 S.Ct. at 2692.

██ The case at bar is similar to *Codispoti*. In both cases the conduct for which each contempt citation was issued was precisely delineated before the determination of sentence, arguably preventing the sentencing court from imposing a sentence exceeding six months for an undifferentiated mass of contemptuous behavior. The Supreme Court in *Codispoti* rejected the argument that this fact transformed each contempt into a separate offense to which the aggregation rule did not apply, and therefore we must reject that argument as well. Moreover, the *Codispoti* court also noted:

Neither are we impressed with the contention that today's decision will provoke trial judges to punish summarily during trial rather than awaiting a calmer, more studied proceeding after trial and deliberating "in the cool reflection of subsequent events." Summary convictions during trial that are unwarranted by the facts will not be invulnerable to appellate review. *Id.* at 517, 94 S.Ct. at 2694 (citations omitted).

Thus, the Court refused to accept the logic behind the second argument advanced by the Government in this case: that we should permit an expansion of the exception in *Seale* because it is advantageous to give

trial courts time to deliberate before imposing sentence.

The only difference between the cases is that in *Codispoti* the sentencing court was also faced with determining whether or not the defendants were guilty of each contempt charge, while in this case the district court found Prewitt guilty of contempt immediately upon termination of his contemptuous conduct and only delayed sentencing. We do not find this distinction to be important. The clear import of *Codispoti* is that exceptions to the right to jury trial are disfavored and will only be permitted in situations where the failure to grant an exception would result in the obvious exhaustion of the trial court's summary contempt powers and concomitant ability to control the trial. Since the trial court's summary contempt powers cannot appear to defendants to be exhausted when sentencing is delayed, this is not such a case.

We therefore hold that the general rule of *Seale* is applicable here and that Prewitt is entitled to a jury trial on the charges of contempt lodged against him. In the alternative the district court may choose to reduce the sentence for contempt to six months.

The defendant's convictions are affirmed in part and vacated in part, and the cause is remanded for further proceedings consistent with this opinion.