**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert James POOLE,**
**Defendant-Appellant.**

**No. 84–5195.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 1985.

Decided July 14, 1986.

---

Duane J. Deskins, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Brad Brian, Los Angeles, Cal., for defendant-appellant.

Before SKOPIL and CANBY, Circuit Judges, and SOLOMON, District Judge *.

CANBY, Circuit Judge:

Robert James Poole was convicted of violating 18 U.S.C. § 2113(a) by robbing the Culver City branch of the First Federal Savings Bank of California. Poole was indicted and tried on three counts of bank robbery; the jury was unable to reach a verdict on two counts. On appeal, Poole contends that the trial court should have suppressed the evidence that Poole gave a false name to an FBI agent. Also, Poole contends that the trial court abused its discretion in excluding expert testimony on the unreliability of eyewitness identifications. We conclude that the district court did not abuse its discretion in excluding this evidence. We conclude, however, that the government obtained the false name evidence in violation of the fifth amendment. Because the error in admitting this evidence was not harmless, we reverse the conviction and remand.

## BACKGROUND

On February 15, 1984, Poole was arrested on two charges of robbing savings and loan associations in Gardena and Pasadena, California. Eyewitnesses had identified Poole as one of the robbers from a photospread prepared by Special Agent Jon Uda of the Federal Bureau of Investigation. On the day of the arrest, after Poole was placed in the custody of the Gardena Police Department, Special Agent Uda interviewed Poole about the robberies. At the outset, Special Agent Uda advised Poole of his *Miranda* rights. Poole refused to sign the advice of rights card and told Uda that he had "nothing to talk about" and that he knew nothing about the robberies. Special Agent Uda did not stop the interview, however. He showed Poole surveillance photographs of the robberies. Poole responded "[t]hat's not me in the surveillance photos." At some point, Special Agent Uda told Poole that he was suspected of committing bank robberies with Henry Minnix and that the FBI had a warrant for Minnix's arrest on an unrelated bank robbery charge. Poole admitted that he had met Minnix a week or two before. This evidence was not admitted at trial. At the close of the interview, Special Agent Uda asked Poole his name, date of birth and place of birth. Poole gave a false name. Special Agent Uda discovered the falsity, prior to Poole's arraignment the next day, when Poole gave his proper name for the federal marshal's form that Special Agent Uda was filling in.

Over Poole's objection,[1] Special Agent Uda testified at trial that Poole falsely identified himself. The jury was instructed that the giving of a false name might show "consciousness of guilt." The court ruled that Poole asserted his right to remain silent before the falsity was elicited. The court concluded, however, that Special Agent Uda inquired about Poole's name for booking purposes and that booking inquiries were not interrogation. Accordingly, the court denied the motion to strike this evidence.

At trial, the evidence against Poole on the Culver City robbery consisted of eyewitness identifications and Special Agent Uda's testimony that Poole gave a false name. The FBI's forensic photography expert who compared the surveillance photographs to Poole's booking photographs stipulated that he was unable to conclude

* The Honorable Gus J. Solomon, Senior Judge, United States District Court for the District of Oregon, sitting by designation.

1. Poole did not move to suppress this evidence prior to trial. The government had not warned Poole that this evidence would be used at trial. At trial, Poole moved to strike Special Agent Uda's testimony. Outside the presence of the jury, the district court heard arguments on the motion and permitted a voir dire of Special Agent Uda. The court concluded that the government should have warned the defendant that this evidence would be used. Fed.R. Crim.P. 12(d)(1). This failure to warn was adequate cause for the court to grant relief from defendant's waiver of his objection to this evidence. Fed.R.Crim.P. 12(f).

whether Poole was one of the robbers. Wendell Casson testified that Poole robbed him and that he had identified Poole in a photospread. Karen Smith testified that she was robbed by Poole's accomplice and that Poole robbed Casson. She too identified Poole in the photospread.

To discredit the eyewitness identifications, Poole planned to introduce expert testimony regarding possible defects in eyewitness identification. Before trial, the government made a motion *in limine* to exclude the expert testimony of Dr. Robert Shomer. That motion was granted. Dr. Shomer would have testified that stress, weapon focus, cross-gender identification, the interval between memory and recall, the suggestibility of the photospread, witnesses' tendency to exaggerate the period of observation and witnesses' desire for conformity all could have affected the eyewitness identifications. At trial, the court instructed the jury on factors to consider in evaluating the reliability of identification testimony.

## DISCUSSION

### I.

Poole contends that the evidence that he gave a false name was obtained by a custodial interrogation, after he asserted his right to remain silent, in violation of the fifth amendment. The government concedes that Poole was in custody when the incriminating evidence was elicited but contends that the evidence was not elicited by interrogation.

The district court found that Poole invoked his *Miranda* protections, prior to the booking inquiries, when Poole said that he had "nothing to talk about." The government does not challenge this finding. The district court concluded, however, that the questions about Poole's name, date of birth and place of birth did not constitute interrogation within the meaning of the fifth amendment.

### A. *Standard of Review*

We have held that the issue whether questioning constitutes interrogation is subject to review under the "clearly erroneous" standard. *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir.1981). We have since observed, however, that our en banc decision in *United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), cast doubt on the continued applicability of the clearly erroneous standard in such cases. *United States v. Gonzalez-Mares*, 752 F.2d 1485, 1489 (9th Cir.1985). Now being required to resolve the issue as it arises in the circumstances of this case, we conclude that the district court's determination is subject to de novo review. There is no dispute of fact now in issue over what questions were asked, whether warnings were given, or what answers were given by Poole. This issue is whether, in light of these established facts, the questions about identity constituted interrogation for purposes of the *Miranda* rule. That determination requires us to "consider legal concepts in the mix of fact and law and to exercise judgment about the values" underlying the *Miranda* rule and the fifth amendment. *McConney*, 728 F.2d at 1202. It is accordingly a matter of de novo review. *Id.; see United States v. Miller*, 769 F.2d 554, 556 (9th Cir.1985) (plain view exception and single-purpose container questions reviewed de novo).

### B. *False Name Evidence*

The *Miranda* rights protect against government overreaching in custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). Once the suspect invokes his *Miranda* protections, the government cannot use any evidence obtained through custodial interrogation unless the suspect knowingly waives his rights. *See id.* at 479, 86 S.Ct. at 1630.[2] "[C]ustodial questioning constitutes interrogation whenever, under all circumstances involved in a given case, the questions are 'reasonably likely to

---

**2.** The government does not suggest that Poole waived his rights.

elicit an incriminating response from the suspect.' " *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1981) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)). An incriminating statement is "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Innis*, 446 U.S. at 301 n. 5, 100 S.Ct. at 1690 n. 5 (emphasis in original).

The government argues that Special Agent Uda "merely was obtaining background indentifying information," not interrogating Poole, when he elicited the false name. The government analogizes this questioning to the routine booking process. Special Agent Uda discovered the falsity when Poole gave his proper name for a standard form that was being completed for the federal marshals. The incriminating evidence, however, was obtained during an earlier interview, which was conducted for an investigatory purpose and not for the booking process.[3] Consequently, we do not deal with an issue of the proper scope of the booking process for *Miranda* purposes. *See United States v. Prewitt*, 553 F.2d 1082, 1085 (9th Cir.), *cert. denied*, 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977); *see also United States v. Booth*, 669 F.2d at 1238; *United States v. Kane*, 726 F.2d 344, 348–49 (7th Cir. 1984); *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir.1983), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984); *United States v. Downing*, 665 F.2d 404, 406 (1st Cir.1981); *cf. United States v. Hinkley*, 672 F.2d 115, 123 (D.C. Cir.1982) (questioning had "clear investigatory purpose"). The issue here is whether, under the circumstances of this case, Special Agent Uda should have known that his questions were reasonably likely to elicit an incriminating response.

Special Agent Uda testified that the February 15 interview concerned the bank robberies Poole was suspected of committing. Special Agent Uda was responsible for investigating those robberies and had prepared the photospreads that led to Poole's arrest. At the outset of the interview, Poole received *Miranda* warnings and asserted his right to remain silent. In the *voir dire*, Special Agent Uda admitted that usually he would have stopped the interview after a suspect said he had "nothing to talk about."[4] Instead, he showed Poole surveillance photographs of the bank robberies and, at some point, mentioned Poole's suspected accomplice by name. Poole responded in his own defense each time. At the close of the interview, Special Agent Uda asked Poole his name, date of birth and place of birth. Poole then gave his incriminating response.

■ We agree with the district court that Special Agent Uda should have stopped the interview immediately after Poole said he had "nothing to talk about." The district court ruled, and we agree, that any evidence obtained from showing the surveillance photographs would be inadmissible. The district court concluded, however, that the questions about Poole's name, date of birth, and place of birth did not constitute interrogation. We disagree.

■ In light of the investigatory purpose of Special Agent Uda's interview, we cannot reasonably separate the questions concerning Poole's identity from the improper interrogation that preceded them. *See United States v. Hinckley*, 672 F.2d at 125–26. The agent's subjective intent in asking the questions relating to identity, while relevant, is not determinative. *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. Whether questioning constitutes interrogation "focuses primarily upon the perceptions of

---

**3.** Poole had been arrested and placed in the custody of the Gardena Police Department. It is clear from the record that Special Agent Uda's interview was no part of whatever clerical processing had occurred when Poole was received into the jail. *See United States v. Mata-Abundiz,* 717 F.2d 1277, 1280 (9th Cir.1983); *United*

*States v. Hinkley,* 672 F.2d 115, 122–23 (D.C.Cir. 1982) (per curiam).

**4.** The government does not contest the district court's ruling that Poole invoked his right to remain silent after being given the *Miranda* warnings.

the suspect." *Id.* By showing Poole the surveillance photographs and asking questions relating to them, Special Agent Uda in effect accused Poole of the robberies. Under the circumstances, Special Agent Uda should have known that Poole would feel compelled to defend himself and might give a false name in reaction to the coercive [5] and accusatory interview.

Under these facts, the district court's reliance upon *United States v. Booth*, 669 F.2d 1231 (9th Cir.1981), was misplaced. It is true that in *Booth* we stated that "[o]rdinarily, the routine gathering of background biographical data will not constitute interrogation." *Id.* at 1238. We recognized, however, that requests for "neutral" information might be subject to abuse and that the ultimate test, in light of all the circumstances, was whether the agent "should have known that a question was reasonably likely to elicit an incriminating response." *Id.* (footnote omitted). We made clear that the determination "must be made on a case-by-case basis." *Id.* at 1237–38.

Our case differs both factually and procedurally from *Booth*. In *Booth*, a police officer stopped a man who fit the description of a robbery suspect. After conducting a pat-down search, the officer put handcuffs on Booth. While waiting for a police car, prior to giving Booth his *Miranda* warnings, the officer asked Booth his name, age and place of residence. The officer also asked him whether he had any identification and whether he had been arrested before. Booth gave his proper name and age but gave incriminating responses about his reasons for being in Portland and about his prior arrest. We upheld, under the clearly erroneous standard then applicable, the district court's findings that the questions about his name, age and residence did not constitute interrogation and that the questions about his reasons for being there and his prior arrests were in-

terrogation. We reasoned that the questions about his name, age and residence were routine and non-investigatory and that nothing in the record suggested that these questions would elicit an incriminating response. Booth in fact gave his proper name.

In the present case, however, these questions were not asked by an arresting officer making a routine inquiry. They were asked by an FBI agent at the close of a custodial interview conducted for investigatory purposes. *See United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir.1982) (immigration investigator's questions about a suspect's alienage was interrogation; questioning "had little, if any, resemblance to routine booking procedures"). We conclude that the questioning about name, date of birth and place of birth constituted interrogation. The false name evidence should have been suppressed.

■ Having reviewed the record, we conclude that this constitutional error was not harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Contrary to the government's assertion, the evidence against Poole was not overwhelming. Poole was identified by the victim teller and by a bank employee robbed by the second robber. No physical evidence linked Poole to this crime. The FBI's forensic photography expert stipulated that he could not conclude whether Poole was the robber in the surveillance photographs.[6] There is a reasonable possibility that the false name evidence might have contributed to the conviction. Accordingly, we reverse the conviction and remand for further proceedings consistent with this opinion. In light of this ruling, we do not reach the question of whether the district court improperly instructed the jury that the giving of a false name could

---

5. By "coercive," we mean that the interview "reflect[ed] a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300, 100 S.Ct. at 1689.

6. The jury was unable to reach a verdict on counts one and two. Poole's wife and an acquaintance gave alibi testimony on count one and Minnix testified on Poole's behalf on count two. Poole also testified in his own behalf.

be considered as showing a consciousness of guilt.

## II.

■ Because the issue may arise on retrial, we next decide whether the district court abused its discretion [7] in excluding expert testimony on the unreliability of eyewitness identification. The trial court has "broad discretion" to admit or exclude expert testimony. Fed.R.Evid. 702; *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1973). We will not reverse the trial court's ruling unless we conclude that it was "manifestly erroneous." *Id.* To be admitted, the testimony must be in accordance with "a generally accepted explanatory theory" that is not known by the average person. *Id.*

In this case, Dr. Shomer would have testified that perception is influenced by and may be distorted by lighting, distance, angle, duration of observation, mental organization, race and culture, stress, motivation to observe, the degree of concentration and focus of attention. Also, he would have testified that memory and recall are influenced by events occurring between observation and the recollection of what was observed. He would have testified that "stress, weapon-focus, cross-gender identification, the amount of time intervening between memory and recall, the suggestibility of the photospread, the witnesses' tendencies to exaggerate the period of observation, and the witnesses' desire for conformity" all could have affected the reliability of Wendell Casson's (the victim teller) and Karen Smith's identifications. Dr. Shomer would not have opined, however, "that a particular witnesses' testimony was 'wrong' or 'unreliable.'"

In ruling on the motion *in limine*, the district court questioned the scientific basis for the proffered testimony. The district court also commented that the proffered testimony was general and suggested that

Dr. Shomer could not testify about the case without dealing with the actual testimony of the witnesses, something Dr. Shomer proposed not to do. Apparently, the court believed that general testimony, not tied to the specific testimony in the case, would not be helpful to the jury.

The district court's ruling is squarely supported by *Amaral*, 488 F.2d at 1152–53, where we upheld the rejection of similar testimony. We are aware that other federal courts and state courts are beginning to accept expert testimony on the psychological factors affecting eyewitness identifications, at least in some circumstances. *See United States v. Downing*, 753 F.2d 1224 (3d Cir.1985) (case remanded for exercise of discretion); *United States v. Smith*, 736 F.2d 1103 (6th Cir.) (per curiam) (testimony admissible under some circumstances), *cert. denied,* —— U.S. ——, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984); *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. McDonald*, 37 Cal.3d 351, 690 P.2d 709, 208 Cal.Rptr. 236 (1984). The reasoning behind those authorities is better directed to the district court at the time it exercises its discretion. The district court having excluded the testimony, we are bound to apply *United States v. Amaral* here. *See United States v. Sims*, 617 F.2d 1371, 1374–75 (9th Cir.1980) (district court did not err in declining to appoint expert on eyewitness testimony for indigent defendant).

In *Amaral*, we stated that "effective cross-examination is adequate to reveal any inconsistencies or deficiencies in the eyewitness testimony." 488 F.2d at 1153. Our review of the record convinces us that this observation proved to be accurate in the circumstances of this case. The district court's ruling on the *in limine* motion was not error.

## CONCLUSION

In sum, we conclude that Special Agent Uda elicited the false name evidence by a

---

**7.** Poole contends that the district court erroneously believed that the proposed testimony was inadmissible as a matter of law and that consequently, the district court failed to exercise its discretion. We conclude that the district court was aware that it had discretion to admit this evidence. The judge's oral comments and findings indicate that he was aware of our cases on expert testimony and knew that he was to exercise his discretion.

custodial interrogation after Poole invoked his *Miranda* protections. This evidence should have been suppressed. Because we conclude that the error was not harmless beyond a reasonable doubt, we reverse the conviction and remand. Also, we conclude that the trial court did not abuse its discretion in excluding the expert testimony.

REVERSED AND REMANDED.

SKOPIL, Circuit Judge, dissenting.

The district court did not err in admitting evidence that the defendant Poole gave a false name to an FBI agent. The district court's judgment of conviction should be affirmed.

I cannot agree with the majority that the government obtained the false name testimony in violation of Poole's rights under the fifth amendment. I agree with the district court's conclusion that the questions by the FBI to Poole regarding Poole's name, and date and place of birth did not constitute an interrogation.

The police are generally under an obligation to inquire about an individual's identity, both for the protection of the individual and the police. This case is indistinguishable from *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir.1981), wherein we concluded these same questions, asked under similar investigatory circumstances, were "routine, noninvestigatory ... [and] totally unrelated to the crime...." That the questions in this case were asked at the close of an interrogation, rather than at some other time during the arrest or investigation of the crime, is irrelevant. There is no indication in the record that the question to Poole regarding his name was likely to elicit an incriminating response. *See id.* "If an [FBI] investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation." *United States v. Mata-Abundis*, 717 F.2d 1277, 1279–80 (9th Cir.1983).

Because I would uphold the district court's decision to admit this evidence, and therefore uphold the judgment of conviction, I dissent.